**IN THE DISTRICT COURT IN AND FOR CREEK COUNTY**
**STATE OF OKLAHOMA**

FILED IN DISTRICT COURT
CREEK COUNTY SAPULPA OK
SEP 02 2025
TIME 1:40
Amanda VanOrsdol, COURT CLERK

1. JOHN HENRY DOVITSKI,
2. HEATHER LEANNE DOVITSKI;
3. J.D., a minor child, by and through his parents and next of friends, JOHN HENRY DOVITSKI and HEATHER LEANNE DOVITSKI;
4. JODI JOHNSON
5. N.J., a minor child, by and through his parents and next of friends, TOMMY ELBERT JOHNSON and JODI JOHNSON,

Plaintiffs,

v.

1. BRET BOWLING, in his Official Capacity as Sheriff of Creek County, Oklahoma;
2. TIMOTHY CASE.

Defendants

Case No.: CJ 2025-314
ROBERT GETCHELL

ATTORNEY LIEN CLAIMED

**PETITION**

COMES NOW, the Plaintiffs, by and through their attorneys of record, SMOLEN | LAW, PLLC, and for their cause of action against the Defendants, state and allege as follows:

**INTRODUCTION**

1. This civil rights action arises out of damages the Plaintiffs sustained when their homes were unnecessarily raided by members of the Creek County Sheriff's Office ("CCSO) on December 7, 2023, pursuant to a search warrant that had been granted by Creek County District



EXHIBIT 2

Court Judge Pamela Hammers based on false and/or misleading statements made by CCSO Deputy, Timothy Case ("Deputy Case").

2. In December of 2023, siblings Heather Dovitski ("Heather") and Tommy Johnson ("Tommy") lived in Creek County with their respective families on a ten-acre plot of land owned by their parents, Tommy and Erma Johnson (referred to collectively as "Mr. and Mrs. Johnson").

3. The property's mailing address was 21362 W. Cedar Lane, Sapulpa, OK 74066, and included two (2) mobile homes.

4. Heather lived in one of the mobile homes with her husband John Dovitski ("John") and their six (6) year old son, J.D. (referred to collectively as the "Dovitskis"), while Tommy lived in the other mobile home with his wife Jodi Johnson ("Jodi") and their thirteen (13) year old son, N.J. (referred to collectively as "the Johnsons").

5. The warrant for the Plaintiffs' homes was sought by Deputy Case in relation to his investigation into several Creek County residents, including Amanda McDonald ("McDonald") and Joseph Holingsworth ("Hollingsworth"), following an overdose death that occurred on July 8, 2023.

6. While the Plaintiffs had no connection to the overdose, McDonald, or Hollingsworth, they were unknowingly dragged into Deputy Case's investigation by simply living next door to Hollingsworth's mother.

7. While investigating McDonald and Hollingsworth, Deputy Case obtained search warrants for McDonald's cell phone location data and GPS information, which he incorrectly relied upon to conclude that Hollingsworth and McDonald were residing on the Plaintiffs' property.



EXHIBIT 2

8. Based on his misinterpretation of McDonald's cell phone location data, Deputy Case sought a search warrant for the Plaintiffs' property. In so doing, Deputy Case submitted an Affidavit that materially misrepresented Plaintiffs' connection to McDonald and Hollingsworth and omitted several key facts which would have negated any finding of probable cause.

9. Despite the Plaintiffs having no criminal record and no relationship with Hollingsworth or McDonald, Judge Hammers issued a search warrant for the Plaintiffs' residence on December 4, 2023, based on Deputy Case's inaccurate and misguided Affidavit.

10. In the early morning hours of December 7, 2023, the Plaintiffs were stirred and/or awoken to Deputy Case and approximately fifteen (15) CCSO deputies, serving the search warrant on the Plaintiffs' residence with their guns drawn.

11. Deputy Case quickly realized that Hollingsworth and McDonald were not at the Plaintiffs' property but were actually next door at Hollingsworth's mother's residence.

12. The Plaintiffs understandably experienced significant fear, emotional distress, and trauma as a result of the unnecessary raid on their homes on December 7, 2023.

## PARTIES, JURISDICTION AND VENUE

13. Plaintiff John Dovitski ("John") is, and was at all times relevant herein, a resident of Creek County, Oklahoma, and the father of minor child Plaintiff J.D.

14. Plaintiff Heather Leanne Dovitski ("Heather") is, and was at all times relevant herein, a resident of Creek County, Oklahoma, and the mother of minor child Plaintiff J.D.

15. J.D. is a minor child who is, and was at all times relevant herein, a resident of Creek County, Oklahoma, residing with his parents, John and Heather Dovitski. J.D. is asserting his claims herein by and through his parents.

16. Jodi Johnson ("Jodi") is, and was at all times relevant herein, a resident of Creek County, Oklahoma, and the mother of minor child Plaintiff N.J.

17. N.J. is a minor child who is, and was at all times relevant herein, a resident of Creek County, Oklahoma, residing with his parents, Tommy and Jodi Johnson. J.D. is asserting his claims herein by and through his parents.

18. Defendant Bret Bowling ("Bowling") is and was at all times relevant hereto, the Sheriff of Creek County, Oklahoma. Sheriff Bowling is sued in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.*, 566 F. App'x 731, 737 (10th Cir. 2014). Thus, in suing the Bret Bowling in his official capacity, Plaintiff has brought suit against Creek County/Creek County Sheriff's Office ("CCSO").

19. Upon information and belief to be confirmed through discovery, Defendant Timothy Case ("Case" or "Deputy Case") is a resident of Creek County, Oklahoma. Deputy Case is sued in his individual capacity for his personal involvement and participation in the violation of Plaintiffs' rights set forth herein, while acting under color of law and within the scope of his employment with the CCSO.

20. The events and occurrences that give rise to this action occurred in Creek County, Oklahoma.

21. On December 6, 2024, Creek County was timely placed on notice of Plaintiff's tort claims in conformance with the Oklahoma Government Tort Claim Act, 51 O.S. § 151, *et seq.*



EXHIBIT 2

22. Creek County took no formal action upon the Tort Claim Notice and the same was deemed denied ninety (90) days thereafter. As such, this action is being timely brought pursuant to and in compliance with the provisions of the Oklahoma Governmental Tort Claims Act ("OGTCA"), 51 O.S. §151 *et. seq.*

23. This Court has jurisdiction, and venue is proper in Creek County, Oklahoma.

**FACTUAL ALLEGATIONS**

24. Paragraphs 1-22 are incorporated herein by reference.

- ***Plaintiffs and Joseph Hollingsworth's Background***

25. As noted above and pictured below, the Dovitskis and the Johnsons lived on a ten-acre plot of land located at 21362 W. Cedar Lane, Sapulpa, OK 74066.



26. There were two (2) trailers on the property, located approximately fifty feet from one another. As pictured below, the Dovitskis lived in the trailer on the west side of the property, while the Johnsons lived in the trailer on the east side of the property.




27. The ten-acre plot directly west of the Plaintiffs (21616 W Cedar Ln. Sapulpa, OK 74066) was owned by Eulene Hollingsworth, the mother of Joseph Hollingsworth ("Hollingsworth").




28. Upon information and belief, Eulene Hollingsworth had owned the property since the mid-90's and had resided there for a period of time with her son, Joseph Hollingsworth ("Hollingsworth").

29. In 2003, Hollingsworth received his first of many criminal charges, which led to him being incarcerated from December 2006 until March 2010, after pleading guilty to several crimes in Creek County District Court.

30. In the years following his 2010 release, Hollingsworth was charged with several more crimes, which led to him being incarcerated a second time from October 2015 until February 2023.

31. Upon his release from custody in February 2023, Hollingsworth went back to live with his mother at 21616 W Cedar Ln. Sapulpa, OK 74066.[1]

---

[1] According to a document filed in a separate criminal matter, "Hollingsworth was released from prison to begin the suspended portion of his sentence on February 9, 2023," and began "residing at 21616 West Cedar Lane in Sapulpa, and had active employment with Cartledge and Cartledge in Kiefer." *See* Exhibit A to *Motion to Revoke Suspended Sentence* filed in *State v. Hollingsworth*, Creek County District Court Case No. CF-2013-0293 on January 16, 2024.

32. At that time, Hollingsworth was dating Amanda McDonald ("McDonald"), who also had a lengthy criminal history related to illegal drug use.

33. While Hollingsworth continued to use drugs and engage in criminal activity following his release from custody in February 2023,[2] he was able to avoid the ire of law enforcement, until July 8, 2023, when a Creek County woman overdosed on Fentanyl that was alleged to have been provided by McDonald, and died.

34. In response to the July 8, 2023, overdose, Deputy Case began a lengthy investigation that was initially focused on McDonald but quickly expanded to Hollingsworth.

35. It was this investigation that led Deputy Case to seek and ultimately obtain the search warrant used to raid the Plaintiffs' homes on December 7, 2023.

36. As will be seen below, a review of Deputy Case's investigation and the Affidavit he submitted in support of his request for the search warrant of the Plaintiffs' property reveals the full scope of Deputy Case's recklessness.

- ***Deputy Case's Investigation and His December 4, 2023 Search Warrant Affidavit***

37. On or about December 4, 2023, Deputy Case submitted an Affidavit (hereinafter referred to as "the Affidavit" or "Deputy Case's Affidavit") to Creek County District Court Judge Pamela Hammers, seeking the issuance of a search warrant for the Plaintiffs' residence (21362 W. Cedar Lane, Sapulpa, OK 74066).

---

2 Hollingsworth was still under the supervision of Probation and Parole following his release from custody in February 2023, which required him to make regular office visits with a probation officer. In a subsequent report, Hollingsworth's probation officer advised that from June 2023 to October 2023, Hollingsworth had either admitted to continued drug use or tested positive for illegal drug use on at least three (3) occasions.



EXHIBIT 2

38. The Affidavit began with Deputy Case describing a number of items – including controlled dangerous substances, drug paraphernalia, proceeds of controlled dangerous substance sales, items showing dominion and control of the premises, firearms, cellular or electronic devices - which Deputy Case believed were present at the Plaintiffs' residence.

39. "As probable cause for believing that [21362 W. Cedar Lane, Sapulpa, OK 74066] contains the items herein described," Deputy Case provided Judge Hammers with the following information regarding his underlying investigation:

a. On July 8, 2023, CCSO deputies were dispatched to a home at 12228 Shaw Drive, Sapulpa, Oklahoma 74066 to assist Creek County EMS with the overdose death of Creek County resident Ashley Malek.

b. A few weeks later, Deputy Case was informed by an investigator with the Creek County District Attorney's Office that Ashley Malek had overdosed on fentanyl, which had been provided by Amanda McDonald ("McDonald").

c. Deputy Case was familiar with McDonald from previous work with the CCSO and believed that she was "involved in illegal narcotics" and was "associated with the address of '12228 Shaw Drive, Sapulpa, OK 74066.'"

d. At or around this same time, Deputy Case learned that McDonald was in a relationship with Hollingsworth, who, according to Deputy Case, had "an extensive criminal record in Creek County…for various crimes, including narcotic-related offenses."

e. Based on this information, Deputy Case began looking into McDonald to obtain evidence regarding her involvement in Ms. Makek's death.

f. Deputy Case began his investigation by obtaining a search warrant for a Facebook account that was shared by McDonald and Hollingsworth on July 13, 2023.

g. On July 20, 2023, Deputy Case received a tip from the CCSO tip line that a number of people, including McDonald and Hollingsworth were "fentanyl dealers dealing out of [12228 Shaw Dr.]."

h. 12228 Shaw Drive was the location of Ms. Makek's overdose, and according to Deputy Case, was one (1) of three (3) addresses known as "McDonald Hill," on account that "Amanda McDonald and her family" were known to reside at those locations.

i. In September 2023, Deputy Case discovered what he believed to be McDonald's cell phone number while going through her Facebook messages.

j. Around that same time, a CCSO investigator, Levi Lackey ("Investigator Lackey"), informed Deputy Case that he had received information from a reliable confidential informant that McDonald was residing with Hollingsworth in a trailer located at 21362 W Cedar Ln, Sapulpa, OK 74066, and that the two were selling fentanyl and methamphetamine.

k. Based on that report, Deputy Case sought a search warrant from AT&T – McDonald's cell phone provider - for "location information, such as real-time global positioning system (GPS) information" for McDonald's phone number.

l. Creek County District Court Judge Douglas Golden granted Deputy Case's search warrant on September 29, 2023.

m. According to Case, he "received numerous GPS pings in the area of the residence of 21362 W Cedar Ln, Sapulpa, OK 74066 from date ranges September 29th, 2023, to October 20th, 2023."

n. After further investigation into some of McDonald's associates, Deputy Case sought a second search warrant for GPS information from McDonald's phone, which was granted by Judge Pamela Hammers on November 29, 2023.

o. According to Case, he "received numerous GPS pings in the area of the residence of 21362 W Cedar Ln, Sapulpa, OK 74066" from November 29, 2023, to December 4, 2023.

p. On December 4, 2023, Deputy Case attested that he spoke with the Oklahoma Department of Corrections Probation and Parole ("Probation and Parole") about Hollingsworth, and was advised that Hollingsworth "was staying with his girlfriend, Amanda McDonald, who lives off of W Cedar Ln."

q. Deputy Case concluded his Affidavit by stating that he knew that "all individuals involved" in the alleged criminal activity were "connected to all 4 locations" described in his Search Warrant Application, including the Plaintiffs' residences.

40. At approximately 2:05 P.M. on December 4, 2023, Judge Hammers signed the search warrant prepared by Deputy Case, due to "[p]robable cause having been shown…by Investigator Timothy Case."

41. The Search Warrant "commanded and instructed" law enforcement officers to search the Plaintiffs' property, "including the curtilage, vehicles thereof, recreational trailers or campers thereof…at any time of day."

42. Upon information and belief, at or around the same time that Deputy Case obtained the search warrant for Plaintiffs' property, he also sought and received search warrants for the three (3) "McDonald Hill" residences.

43. Thereafter, on the morning of December 6, 2023, the search warrants for the three (3) McDonald Hill addresses were executed by members of the Oklahoma Highway Patrol ("OHP") Tactical Team. During the execution of those search warrants, narcotics and drug paraphernalia were recovered and a number of individuals, including several of the persons identified in Deputy Case's Search Warrant Application, were located and arrested. McDonald and Hollingsworth were not located during the service of those search warrants.

- ***The December 7, 2023 Search***

44. Prior to the execution of the search warrant on Plaintiffs' property, Deputy Case put together an Operational Plan which described the focus of the search warrant as McDonald and Hollingsworth.

45. The Operational Plan outlined that there would be two "entry teams," each comprised of four (4) CCSO deputies. One of the entry teams was responsible for searching the Dovitskis trailer, while the other entry team was assigned to search the Johnsons trailer.

46. Deputy Case and a host of CCSO deputies arrived at the Plaintiffs' property just prior to 6:20 a.m. on December 7, 2023, to execute the warrant.



EXHIBIT 2

47. At approximately 6:20 a.m., a member of the CCSO, who was holding what appeared to be some kind of large hammer or axe and backed by several other CCSO deputies, knocked on the Dovitskis front door, and yelled "Sheriff's Office open the door."

48. John, who had just woken up, walked to the front of his trailer and opened the front door. Upon opening his door, John was met by a number of CCSO deputies, several of whom had their guns pointed directly at him, yelling at him to put his hands in the air.



49. John did as instructed and was placed in handcuffs by the officer who had the hammer/axe, while three (3) other officers made their way into the Dovitskis' home yelling for anyone to come out with their hands up.



EXHIBIT 2

50. Shortly after entering the home, an officer came upon Heather, who was visibly terrified, with the family dog. On boy cam footage, Heather can be heard crying, telling officers that her six (6) year old son was the only other person in the house. At that point, there were at least four or five CCSO officers in the Dovitskis' house, all of whom had their weapons drawn.

51. Officers made their way to a back bedroom, where J.D. was sleeping. Deputies wrestled J.D. awake, made him go outside where his father was handcuffed.

52. At or around the same time, a group of deputies, with their guns drawn, made their way to the Johnsons home.

53. Tommy, who had left for work just minutes before the officers arrived at the residence, was not home. However, Jodi and a friend who was staying with the family were startled awake when they heard CCSO deputies screaming outside their front door, demanding that they come outside with their hands in the air.

54. Jodi was placed in handcuffs, while other deputies made their way through her home before coming across the Johnsons' son, N.J., who was also asleep.

55. CCSO deputies remained on scene and continued to look through the two (2) residences despite the Plaintiffs' assertions that they had the wrong address.

56. During this time, Jodi informed Deputy Case and other deputies that Hollingsworth lived next door at 21616 W Cedar LN. Sapulpa, OK 74066, which led Deputy Case to seek, AND ultimately obtain, a search warrant for that location.[3]

---

3 Before leaving the Plaintiffs' property, Deputy Case apologized, stating that he "was the reason the Creek County Sheriff's Office was out there."

57. At approximately 8:20 a.m. that same morning, the CCSO executed a search warrant for 21616 W Cedar LN. Sapulpa, OK 74066, where Hollingsworth, McDonald, and others were located and arrested.

- ***Discrepancies in Deputy Case's Search Warrant***

58. The Fourth Amendment provides that "no Warrants shall issue, but on probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.[4]

59. "Probable cause to issue a search warrant exists if the supporting affidavit provides facts sufficient to 'lead a prudent person to believe that a search of the described premises would uncover contraband or evidence of a crime.'" *United States v. Ramos-Castillo*, 410 F. Supp. 3d 1223, 1244 (D.N.M. 2019) (citing *United States v. Sanchez*, 555 F.3d 910, 914 (10th Cir. 2009)

60. The Tenth Circuit has explained that "a search warrant may issue ***only*** if 'given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Pena*, No. 22-2154, 2024 WL 2264137, at *3 (10th Cir. May 20, 2024) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (emphasis added)).[5]

61. "A [search] warrant lacks validity 'if there is substantial evidence to support deliberate falsehood or reckless disregard for the truth, and the exclusion of false statements would

---

4 *See also United States v. Ramos-Castillo*, 410 F. Supp. 3d 1223, 1244 (D.N.M. 2019) ("For a warrant authorizing the government's search of an individual's residence, probable cause is required.") (citing *United States v. Biglow*, 562 F.3d 1272, 1275 (10th Cir. 2009)).

5 *See also United States v. Knox*, 883 F.3d 1262, 1275 (10th Cir. 2018) ("An affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the fair probability that contraband or evidence of a crime will be found in a particular place.") (internal quotation marks omitted))

undermine the existence of probable cause.'" *Cyr v. Crow*, No. CIV-19-1029-HE, 2022 WL 18635567, at *15 (W.D. Okla. Nov. 16, 2022), *report and recommendation adopted*, No. CIV-19-1029-HE, 2023 WL 1808349 (W.D. Okla. Feb. 7, 2023) (citing *Harte v. Bd. of Comm'rs of Johnson Cnty.*, 864 F.3d 1154, 1162 (10th Cir. 2017)).[6]

62. "Additionally, the *omission* of a material fact from the warrant affidavit has been held to constitute a violation of the Fourth and Fourteenth Amendments." *United States v. Morgan*, No. 10-CR-194-JHP, 2011 WL 1045528, at *2 (N.D. Okla. Mar. 16, 2011) (citing *Stewart v. Donges,* 915 F.2d 572, 582–83 (10th Cir.1990) (emphasis in original)).[7]

63. Here, Deputy Case made several overt and material misrepresentations and omissions in his Search Warrant Affidavit, which can be seen in reports he and CCSO Investigator Levi Lackey prepared after the botched raid.

64. For instance, in his Search Warrant Application, to support his assertion that McDonald and Hollingsworth were at the Plaintiffs' property, Deputy Case averred that in September 2023, "Investigator Levi Lackey received information from a reliable confidential informant that Amanda McDonald was residing at 21362 W Cedar Ln. Sapulpa, OK 74066, with Joe Hollingsworth in a trailer and that they were selling fentanyl and methamphetamine."

65. However, following the December 7, 2023, search of Plaintiffs' homes, Investigator Lackey wrote that he had "provided information from a Reliable Confidential

---

6 *See also Robitaille v. Spitzer*, 175 F. Supp. 3d 1299, 1303 (D. Colo. 2016) ("an affiant's inclusion of a 'false statement knowingly, or with reckless disregard for the truth' in an application for a warrant can form the basis for a Fourth Amendment violation.") (citing *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)).

7 *See also Long v. Boucher*, 706 F. Supp. 3d 1329, 1339 (D. Utah 2020) ("It is well settled that dishonesty or recklessness can involve not only affirmative misrepresentations, but also omissions of material fact.") (citing *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014)).

Informant to Investigator Ryan Case…that [McDonald] and [Hollingsworth] were residing at a residence ***that fits the description*** of 21362 West Cedar Lane, Sapulpa, Oklahoma 74066." (emphasis added).

66. Deputy Case similarly advised – after the fact – that Lackey had passed along information from a confidential informant that "Amanda McDonald was residing at a residence ***that met the description*** of 362 West Cedar Lane, Sapulpa, Oklahoma 74066, with Joseph Hollingsworth and that they were selling fentanyl and methamphetamine."[8]

67. In other words, while Deputy Case had been told that a confidential informant had identified that McDonald and Hollingsworth were living at a trailer that *fit the description of the Plaintiffs' residences*, Deputy Case affirmatively informed Judge Hammers that "a reliable confidential informant" had advised that McDonald and Hollingsworth were actually "residing at 21362 W Cedar Ln. Sapulpa, OK 74066."

68. Deputy Case's Search Warrant Affidavit further completely omitted the fact that Hollingsworth's mother lived next door to the Plaintiffs' residence.

69. Deputy Case's Affidavit included a legal description and photograph of the Plaintiffs' property, which he obtained from "landowner's maps" available from the Creek County Assessor.

70. These landowners' maps make clear that Eulene Hollingsworth lives directly to the west of the Plaintiffs, on a property that had several trailers that looked similar to the ones lived in by the Plaintiffs.

---

[8] Both Hollingsworth and the Plaintiffs were living in a generic looking double wide trailer. Because there were an untold number of similar trailers in that area at the time, any alleged identification is of little value.



EXHIBIT 2

71. Despite that fact, Deputy Case informed Judge Hammers that he "received numerous GPD pings in the area of the residence of 21362 W Cedar Ln, Sapulpa OK 74066," but wholly omitted that Hollingsworth's mother lived directly next door.

72. And because Deputy Case's belief that McDonald and Hollingsworth were located on the Plaintiffs' property was based on his interpretation of cell phone location tracking data – an inherently inexact technology[9] – it was even more important that Deputy Case reference the fact that Hollingsworth's mother lived next door to the Plaintiffs.

73. To make matters worse, Deputy Case did not just omit the fact that Hollingsworth's mother lived next door from his Search Warrant Affidavit but made representations to the Court to conceal and misconstrue that fact.

74. For instance, in support of his belief that Hollingsworth and McDonald were residing on the Plaintiff's Property, Deputy Case referenced a conversation he had with Hollingsworth's probation officer regarding Hollingsworth's whereabouts:

> On December 4, 2023, I spoke with the Department of Corrections Probation and Parole in reference to Joseph Hollingsworth. They confirmed that he was staying with his girlfriend Amanda McDonald, who lives off of W Cedar Ln.

75. However, in the written report he prepared after the botched raid, Deputy Case noted that while Probation and Parole had advised that Hollingsworth "was staying with his

---

[9] *See, e.g., In re U.S. ex rel. an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel.,* 849 F.Supp.2d 526, 534 (D.Md.2011) ("depending upon a variety of factors the accuracy of cell-site location data may range from miles in diameter to individual floors and rooms within buildings"); *United States v. Graham,* 846 F.Supp.2d 384, 392 (D.Md.2012) ("historical cell site location records ... can only reveal the general vicinity in which a cellular phone is used"); *The Two Towers: The Abuse of Mobile Phone Data,* The Economist, Sept. 6, 2014, http://www.economist.com/node/21615622/print ("Routinely collected tower data can place a mobile phone in a broad area, but it cannot 'pinpoint' it.").



EXHIBIT 2

girlfriend, Amanda McDonald, who lives off of W Cedar Ln," they also informed him that "the address Joseph listed was 21616 W Cedar Ln. Sapulpa, OK 74066," which "was next door from" the Plaintiffs' residences.

76. Due to the proximity of the two residences and the intricacies involved with location tracking data, there would be no reason for Deputy Case not to inform Judge Hammers that Hollingsworth's mother lived next door to the Plaintiffs.

77. Due to the proximity of the two residences and the intricacies involved with location tracking data, there was no reason to obscure the fact that Hollingsworth's mother lived next door to the Plaintiffs. Nevertheless, in what can only be inferred as an attempt to mislead, Deputy Case omitted that fact from the Affidavit he submitted to Judge Hammers.

78. When considering Deputy Case's Affidavit in light of the facts he omitted, there is no question that no probable cause existed to search the Plaintiffs' home.

79. When considering Deputy Case's Affidavit in light of these omitted facts,[10] there is no question that there was no probable cause to believe that evidence of any crime committed by McDonald or Hollingsworth was present on the Plaintiffs' property.[11]

---

[10] *Long*, 706 F. Supp. 3d at 1336 ("When information has been omitted from an affidavit, 'the existence of probable cause is determined by examining the affidavit ... as if the omitted information had been included and inquiring if the affidavit ... would still have given rise to probable cause.'" (citing *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011) (internal quotation marks omitted)).

[11] *United States v. Soderstrand*, 412 F.3d 1146, 1152 (10th Cir. 2005) ("An affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the fair probability that contraband or evidence of a crime will be found in a particular place.").



EXHIBIT 2

- ***Creek County Policies, Practices, and Customs***

80. There is an affirmative causal nexus between the wrongful raid and search of the Plaintiffs' property and the policies, customs, and/or practices of the CCSO, which Defendant Bowling and/or Creek County promulgated, created, and/or implemented.

81. As noted above, "the Supreme Court [has] established that an affiant's inclusion of a 'false statement knowingly, or with reckless disregard for the truth' in an application for a warrant can form the basis for a Fourth Amendment violation." *Robitaille v. Spitzer*, 175 F. Supp. 3d 1299, 1303 (D. Colo. 2016) (citing *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)).

82. Despite the long-established law in this regard, on information and belief, the County/CCSO failed to adequately train and supervise its deputies, including Deputy Case, with respect to, inter alia:

a. The preparation of affidavits for search warrants;
b. The need for, and the process of verifying information related to a search warrant application;
c. The use of information provided by confidential informants in obtaining search warrants;
d. How confidential informant information should be verified or corroborated;
e. The importance of not omitting exculpatory information from probable cause affidavits and other documents utilized to obtain search warrants

83. Moreover, Deputy Case's misuse and/or misinterpretation of McDonald's cell phone location information, which was the primary basis for him seeking the search warrant, was due to the lack of training he received on that issue.

84. Upon information and belief, the CCSO has an established pattern and practice of utilizing GPS/cell phone tracking technology during criminal investigations.[12] And while cell

---

12 Investigator Lackey advised that the CCSO has "used GPS pings as a reliable tool in past investigations."

phone tracking data can be a useful tool for law enforcement to use during an investigation, it is not 100% accurate.[13] Furthermore, because of the complexities involved with the use of GPS or Cell Phone tracking data, extensive training and expertise is required before relying on the technology.[14]

85. Despite the glaring and obvious need to ensure that its law enforcement officers were trained on the use of cell phone location tracking technology, the CCSO failed to do so.

86. The CCSO's failure to train its deputies in this regard resulted in Deputy Case being unqualified and unable to utilize the technology, which led to him unnecessarily seeking the search warrant for the Plaintiffs' property.

**COUNT I – Unlawful Search in Violation of the Fourth Amendment to the United States Constitution.**
***(42 U.S.C. § 1983)***

87. Paragraphs 1-86 are incorporated herein by reference.

***a. Deputy Case***

88. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV.

89. The Fourth Amendment also provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV.

---

13 *See,* n. 9, *supra.*

14 In fact, Courts have explicitly held that pinpointing a cell phone in relation to a cell tower involves "specialized knowledge not readily accessible to any ordinary person." *United States v. Yeley-Davis*, 632 F.3d 673, 684 (10th Cir. 2011).



EXHIBIT 2

90. A search or seizure of persons, houses, papers, or effects is unreasonable when unsupported by probable cause.

91. Here, the search of Plaintiffs' homes was unreasonable as there was no probable cause to believe that contraband or evidence from McDonald or Hollingsworth was on the Plaintiffs' property.[15]

92. Moreover, it was clearly established, long before December 2023, that:

a. "An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause." *Illinois v. Gates,* 462 U.S. 213, 239 (1983).

b. "[A] warrant must be supported by *facts* demonstrating probable cause, not by police summaries of what they have concluded from such facts." *United States v. Roach*, 582 F.3d 1192, 1203 (10th Cir. 2009) (citing *Illinois v. Gates,* 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527) (emphasis in original)).

c. An affiant "violates the Fourth Amendment when he knowingly and intentionally, or with reckless disregard for the truth, includes a false statement in [a] warrant affidavit." *Marin v. King*, 720 Fed.Appx. 923, 936 (10th Cir. 2018) (quoting *Frank v. Delaware*, 438 U.S. 154, 155-56 (1978)) (internal punctuation omitted).

d. "It is a violation of the Fourth Amendment… to knowingly or recklessly omit from the affidavit information which, if included, would have vitiated probable cause." *Wolford v. Lasater,* 78 F.3d 484, 489 (10th Cir. 1996).

93. Here, as described supra, Deputy Case deliberately or with reckless disregard for the truth omitted several exculpatory material facts from his affidavit that, if included, would have vitiated probable cause.

94. Any reasonable officer in Deputy Case's position knew or should have known that his conduct was a violation of clearly established law at that time.[16]

---

15 *See, Soderstrand*, 412 F.3d at 1152 ("An affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the fair probability that contraband or evidence of a crime will be found in a particular place.").

16 *See, e.g., Stewart*, 915 F.2d at 582–83 ("[W]e hold that at the time defendant submitted his affidavit and arrested plaintiff, it was a clearly established violation of plaintiff's Fourth and



EXHIBIT 2

95. Deputy Case's conduct in seeking and obtaining the search warrant of the Plaintiffs' property and then proceeding to execute the warrant violated the Plaintiffs clearly established Fourth Amendment rights.

96. As a direct and proximate result of Deputy Case's actions, the Plaintiffs suffered damages, including, but not limited to, fear, emotional trauma, humiliation, emotional distress, and other damages as alleged herein.

***b. Official Capacity Liability (Against Sheriff Bowling)***

97. There is an affirmative causal nexus between the violation of Plaintiff's Fourth Amendment rights and established policies or customs that were maintained by the County/CCSO.

98. Such policies, customs and/or practices are specifically set forth in paragraphs 80-86, *supra*.

99. In particular, the County/CCSO had an established custom and practice of failing to adequately train its deputies, including Deputy Case, with respect to the following:

a. The Fourth Amendment rights of citizens;
b. The preparation of affidavits for search warrants;
c. The need for, and the process of verifying information related to a search warrant application;
d. The use of information provided by confidential informants in obtaining search warrants;
e. How confidential informant information should be verified or corroborated;
f. The use of cell phone location tracking technology;
g. How cell phone location data should be verified or corroborated;
h. The importance of not omitting exculpatory information from probable cause affidavits and other documents utilized to obtain search warrants

Fourteenth Amendment rights to knowingly or recklessly omit from an arrest affidavit information which, if included, would have vitiated probable cause").



EXHIBIT 2

100. Upon information and belief, the CCSO's failure to train its staff, including Deputy Case, on these topics, resulted in an established pattern and practice of the CCSO conducting searches of individuals homes without probable cause

101. These policies and customs were closely related to the violation of Plaintiffs' constitutional rights.

102. The risk in maintaining the above-described policies and customs was so obvious that it amounted to deliberate indifference to the rights of persons with whom the CCSO comes into contact. Put another way, the risk accompanied by maintaining the above-described policies and customs was so obvious that the County/CCSO should have known of it.

103. Sheriff Bowling, the County, and the CCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices – in spite of their known and obvious inadequacies and dangers – has been deliberately indifferent to citizens', including Plaintiff's, constitutional rights.

104. As a direct and proximate result of the aforementioned policies, practices and/or customs, the Plaintiffs suffered damages, including, but not limited to, fear, emotional trauma, humiliation, emotional distress, and other damages as alleged herein.

105. Plaintiffs are further entitled to punitive damages, as Deputy Case's conduct, acts, and/or omissions, as alleged *supra*, constitute reckless or callous indifference to Plaintiffs' constitutionally protected rights

**COUNT II – Negligence/ Wrongful Search**
***51 O.S. § 151, et seq.***
**(As to Defendant Bowling/Creek County)**

106. Paragraphs 1-105 are incorporated herein by reference.



EXHIBIT 2

107. "Oklahoma law does recognize a civil action for damages from causing the issuance and service of a search warrant, maliciously and without probable cause." *Tanique, Inc. v. State ex rel. Oklahoma Bureau of Narcotics & Dangerous Drugs*, 2004 OK CIV APP 73, ¶ 17, 99 P.3d 1209, 1215 (citing *Williams v. Frey,* 1938 OK 280, 182 Okla. 556, 78 P.2d 1052).

108. Here, Deputy Case owed Plaintiffs a duty to use reasonable care when investigating crimes and when seeking a warrant for the search of a residence. Deputy Case further owed a duty to provide accurate information to a Judge when seeking a search warrant and to not omit any material facts that are relevant to the probable cause inquiry.

109. Deputy Case breached the duty he owed to the Plaintiffs when he included false and/or inaccurate information in his Search Warrant Affidavit and when he omitted several material facts which would have vitiated any finding of probable cause.

110. Deputy Case's actions were taken in the course and scope of his employment with the County/CCSO.

111. The County/CCSO is liable for Deputy Case's actions, as alleged *supra*, pursuant to the Oklahoma Government Tort Claim Act, 51 O.S. § 151, *et seq*.

112. As a direct and proximate result of Deputy Case's tortuous conduct, Plaintiffs suffered damages, including, but not limited to, fear, emotional trauma, humiliation, emotional distress, and other damages as alleged herein.

**COUNT III – Negligence**
**(*As to Deputy Case*)**

113. Paragraphs 1-61 are incorporated herein by reference.

114. Plaintiffs alternatively allege that Deputy Case acted outside the scope of his employment with the CCSO when he knowingly and/or recklessly misrepresented and omitted material facts regarding his investigation from his Search Warrant Affidavit, such that the



EXHIBIT 2

Oklahoma Governmental Tort Claims Act, 51 O.S. § 153(C) does not exempt him from personal liability.[17]

115. As noted above, Deputy Case had a duty to the Plaintiffs to seek a search warrant only when there was probable cause to believe that evidence of a crime was present and to provide all relevant and pertinent information to the Judge considering his request for the issuance of a search warrant.

116. Deputy Case breached the duty he owed to the Plaintiffs when he included false and/or inaccurate information in his Search Warrant Affidavit and when he omitted several material facts which would have vitiated any finding of probable cause.

117. Deputy Case's actions in this regard were grossly negligent and outside the course and scope of his employment with the CCSO.

118. As a direct result of Deputy Case's actions, Plaintiffs suffered damages, including, but not limited to, fear, emotional trauma, humiliation, emotional distress, and other damages as alleged herein.

119. Moreover, because Deputy Case's actions were taken in reckless disregard of Plaintiffs' rights, Plaintiffs are entitled to punitive and exemplary damages against Deputy Case.

WHEREFORE, premises considered, Plaintiffs pray that this Court grant them the relief sought, including but not limited to, damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, punitive damages, reasonable attorney fees, and all other relief deemed appropriate by this Court.

---

[17] "[T]he GTCA do[es] not apply to claims that arise from the conduct of employees that fall outside the course and scope of employment…It has long been established that immunity under the GTCA does not extend to governmental employees 'who acted in a willful or wanton manner.'" *Spencer v. Nelson*, 2024 OK 63, ¶ 16, 557 P.3d 144, 150 (citing *Holman By and Through Holman v. Wheeler*, 1983 OK 72, ¶ 15, 677 P.2d 645, 647).



EXHIBIT 2

Respectfully submitted,

SMOLEN | LAW, PLLC

Donald E. Smolen, II, OBA #19944
John W. Warren, OBA #33635
611 S. Detroit Ave.
Tulsa, OK 74120
P: (918) 777-4LAW (4529)
F: (918) 890-4529
don@smolen.law
jack@smolen.law
*Attorneys for Plaintiffs*



EXHIBIT 2